**Morton P. MAISH, Appellant–Defendant,**

v.

**STATE of Indiana, Appellee–Plaintiff.**

**No. 89A05–0904–CR–199.**

Court of Appeals of Indiana.

Nov. 19, 2009.

Rehearing Denied Jan. 20, 2010.

Amy K. Noe, Allen Wellman McNew, LLP, Richmond, IN, Attorney for Appellant.

Gregory F. Zoeller, Attorney General of Indiana, George P. Sherman, Deputy Attorney General, Indianapolis, IN, Attorneys for Appellee.

## OPINION

BROWN, Judge.

Morton P. Maish appeals his conviction for dealing in cocaine as a class B felony.[1] Maish raises one issue, which we restate as whether the evidence is sufficient to sustain his conviction. We affirm.

The facts most favorable to Maish's conviction follow. In March 2006, Wayne County Detective Michael Lieberman was working with a paid confidential informant with the Wayne County Drug Task Force

1. Ind.Code 35–48–4–1 (Supp.2001) (subsequently amended by Pub.L. No. 151–2006, § 22 (eff. July 1, 2006)).

Office (hereinafter referred to as "C.I. 961"). On March 20, 2006, C.I. 961 was contacted by phone by Amy Pence. Based upon the C.I. 961's conversation with Pence, Detective Lieberman and C.I. 961 determined that the potential existed to conduct a controlled buy with Pence.

To prepare for the controlled buy, Detective Lieberman obtained $175.00 from the Wayne County Task Force. Richmond Police Officer Andy Jury conducted a complete search of the Drug Task Force vehicle that would be utilized during the controlled drug buy to ensure that no contraband or paraphernalia was located in the vehicle. Officer Jury also prepared a "pre-buy statement," which outlined the controlled buy plan, including the names of the prospective target, the substance the informant planned to buy, and how much the informant planned to pay for the substance. Transcript at 138. Richmond Police Officer Aly Tonuc conducted a thorough strip search of C.I. 961 prior to the buy to make sure she did not have any contraband in her possession. In addition, recording and transmitting equipment was placed on C.I. 961.

Detective Lieberman and C.I. 961 drove to Pence's residence in the Task Force vehicle, and Pence got into the back seat of the vehicle. Pence believed that Detective Lieberman was C.I. 961's uncle and indicated that she still needed to obtain the cocaine. Pence directed Detective Lieberman to the residence of Maish. However, Pence determined that Maish was not home, and Detective Lieberman drove to a nearby store so that Pence could purchase a pack of cigarettes. After purchasing the cigarettes, Pence indicated that she wanted to "go ahead and get the money settled up." *Id.* at 318. Detective Lieberman gave Pence the $175.00 for the purchase of

cocaine, and Pence indicated that she was going to purchase the drugs from Maish. Detective Lieberman continued to drive around while Pence used a cell phone to make and receive calls. As Pence made these calls, she gave Detective Lieberman "information regarding [Maish's] whereabouts and estimated time of arrival to the area and also what type of vehicle [Maish] would be arriving in the area in." *Id.* at 296. Detective Lieberman learned that Maish would arrive in a black Dodge Durango. Pence also indicated that she could acquire "an eight ball of cocaine" for $155.00, but that she wanted a $20.00 in payment for providing her services of acquiring the cocaine. *Id.* at 302.

After driving around for approximately thirty minutes, Detective Lieberman parked the Task Force vehicle on the side of North 20th Street facing north. The Durango traveled eastbound on North E Street and then turned southbound onto North 20th Street. The windshield and the front door windows of the Durango were not tinted, but the windows on the back of the vehicle were darker. As the Durango approached the Task Force vehicle, Pence exited the Task Force vehicle and walked to the southeast corner of the intersection of North 20th Street and North D Street. The Durango traveled southbound on North 20th Street past the Task Force vehicle, turned eastbound onto North D Street, and pulled to the side of the road. Pence entered the Durango and sat in the back seat on the passenger side. Maish was seated in the front passenger seat of the Durango. Richmond Police Captain Thomas Porfidio, who "could clearly see that Mr. Maish was seated in the passenger seat" of the Durango, observed Maish take "something from his coat" and "Mr. Maish hand[ ] Ms. Pence something over his left shoulder." *Id.* at

190, 210.[2]

The Durango traveled eastbound on North D Street and left Detective Lieberman's field of vision for approximately two minutes. Detective Lieberman observed the Durango reappear traveling northbound on North 20th Street, turn eastbound onto North D Street, and pull over and park at the same location on North D Street where Pence entered the vehicle. Pence exited the Durango and returned to the Task Force vehicle. Pence gave Detective Lieberman a plastic baggie containing cocaine. Maish was arrested during a raid conducted several months after the buy. Pence was not searched prior to the buy and had not been fitted with any audio transmitting devices.

On July 13, 2006, the State charged Maish with dealing in cocaine as a class A felony. Pence, Detective Lieberman, Captain Porfidio, Officer Jury, and Officer Tonuc testified at Maish's trial. Also, the State and Maish provided a written stipulation as to the following, which the trial court read to the jury: (a) "an audio tape exists that contains the conversation between Amy Pence, Mike Lieberman, and Confidential Informant 961, from the wire worn by Confidential Informant 961;" (b) the "actual transaction with [Maish] is not on the tape;" (c) the audio tape contained a conversation between Pence, C.I. 961, and Detective Lieberman "regarding Pence obtaining cocaine from Morton Maish;" (d) the audio tape contained "phone conversations between Pence and allegedly Maish regarding the meeting location;" and (e) "the tape itself is not being admitted. . . ." *Id.* at 321–322.

The jury found Maish guilty of the lesser included offense of dealing in cocaine as a class B felony. On February 10, 2009, the trial court sentenced Maish to fourteen years to be served in the Indiana Department of Correction.

 The sole issue is whether the evidence is sufficient to sustain Maish's conviction. When reviewing the sufficiency of the evidence to support a conviction, we must consider only the probative evidence and reasonable inferences supporting the verdict. *Drane v. State,* 867 N.E.2d 144, 146 (Ind.2007). We do not assess witness credibility or reweigh the evidence. *Id.* We consider conflicting evidence most favorably to the trial court's ruling. *Id.* We affirm the conviction unless "no reasonable fact-finder could find the elements of the crime proven beyond a reasonable doubt." *Id.* (quoting *Jenkins v. State,* 726 N.E.2d 268, 270 (Ind.2000)). It is not necessary that the evidence overcome every reasonable hypothesis of innocence. *Id.* at 147. The evidence is sufficient if an inference may reasonably be drawn from it to support the verdict. *Id.*

 "The question . . . is whether the inferences supporting the judgment were reasonable, not whether there were other 'more reasonable' inferences that could have been made." *Brink v. State,* 837 N.E.2d 192, 197 (Ind.Ct.App.2005) (quoting *Thompson v. State,* 804 N.E.2d 1146, 1150 (Ind.2004)), *trans. denied.* "Reaching alternative inferences such as this is a function of the trier of fact, not this Court. We cannot reverse the conviction merely because this inference is a plausible one that might have been drawn from the evi-

---

2. Captain Porfidio had set up a position near North 20th Street and North D Street so that he "could take a video surveillance." Transcript at 187. Officer Jury and Officer Tonuc were providing surveillance at North 20th Street and North D Street. All of the officers participating in the buy were able to hear all communications in the Task Force vehicle using the transmitting equipment that C.I. 961 was wearing.

dence." *Id.* Indeed, the Indiana Supreme Court has stated:

> Triers of fact determine not only the facts presented to them and their credibility, but any reasonable inferences from facts established either by direct or circumstantial evidence. It is not necessary that the court find the circumstantial evidence excludes every reasonable hypothesis of innocence. It need only be demonstrated that inferences may reasonably be drawn which support the finding of guilt.

*Thompson,* 804 N.E.2d at 1150 (quoting *Metzler v. State,* 540 N.E.2d 606, 610 (Ind. 1989)).

■ The offense of dealing in cocaine is governed by Ind.Code § 35–48–4–1, which provides that "[a] person who: knowingly or intentionally ... delivers ... cocaine ... commits dealing in cocaine ... a Class B felony...." Thus, to convict Maish of dealing in cocaine, the State needed to prove that Maish knowingly or intentionally delivered cocaine to Pence.

Maish argues that the evidence was insufficient to prove "that he was responsible for delivering cocaine" because "the officers did not witness an exchange, did not properly search the buyer, and did not, at all possible times, keep the buyer under surveillance." Appellant's Brief at 7–8. Maish also argues that "[t]he trier of fact was expected to make the inference that Pence could have only obtained the cocaine during her meeting with [Maish] in the Durango." *Id.* at 10. Maish points out that Pence was not searched by police prior to her involvement in the buy and argues that no evidence showed that "the officers, who were present for the very purpose of surveying [sic] a drug purchase, ever actually witnessed an exchange from one person to another of a controlled substance." *Id.* at 10–11. Maish further argues that "[t]here was insufficient evidence

to prove that [Maish] was the one who transferred cocaine into the possession of Amy Pence." *Id.* at 9.

In support of his argument that he should not have been convicted of dealing in cocaine as there was no evidence that he delivered any cocaine to Pence, who gave cocaine to Detective Lieberman, Maish cites *Watson v. State,* 839 N.E.2d 1291 (Ind.Ct.App.2005). In *Watson,* the defendant met a confidential informant at a fast food restaurant, and later the confidential informant had cocaine. The court reversed the defendant's conviction and held that the evidence was insufficient to show the defendant had delivered the cocaine to the confidential informant because the informant was not searched prior to the buy and the informant was not at trial to testify she received the cocaine from the defendant. 839 N.E.2d at 1293–1294.

We note that this case is distinguishable from *Watson.* First, unlike the informant in *Watson,* Pence was not a confidential informant. Pence did not know that she would be delivering cocaine to a police officer and thus did not know that she could frame Maish for delivering cocaine. Rather, Pence was the person from whom police were trying to obtain cocaine, and she presumably may have been convicted for a cocaine-related offense even if a third party brought the cocaine to her.

Second, Pence actually testified. The court in *Watson* observed "that had the [informant] testified *or* had she been properly searched before the buy, the jury would have had a reasonable basis for believing [the defendant] had the cocaine before the buy." 839 N.E.2d at 1294 (emphasis added). Here, Pence testified that she remembered being picked up by Detective Lieberman and C.I. 961, being given money, going to the location where she met Maish, meeting with Maish, and Maish

providing her with cocaine in his vehicle.[3] The record also reveals that Pence testified that cocaine was not part of her drug problem and that it would not have been normal for her to have cocaine or a large sum of money in her possession in March 2006. When asked if he had any concerns that Pence may have had drugs on her when she got into the Durango, Detective Lieberman testified "[n]o, not at all." Transcript at 301. Detective Lieberman further testified:

I had given [Pence] the money for the drugs at approximately half an hour to forty-five minutes prior to that point in time. And, it's not reasonable to me that if she had drugs on her that she wouldn't have provided them to me when I gave her the money. I've been involved, as I said, in hundreds if not over a thousand control [sic] buys and I don't know of a situation like that that has ever occurred.

*Id.* at 301.

In addition, the record also reveals that Detective Lieberman gave Pence $175.00 for the purchase of cocaine, and Pence indicated that she was going to purchase the drugs from Maish. While in the Task Force vehicle, Pence gave Detective Lieberman "information regarding Morton's whereabouts and estimated time of arrival to the area and also what type of vehicle [Maish] would be arriving in the area in." *Id.* at 296. Pence indicated that she could acquire "an eight ball of cocaine" for Detective Lieberman for $155.00, but that she wanted $20.00 in payment for providing her services of acquiring the cocaine. Transcript at 302. A short while later, as the Durango approached the Task Force vehicle, Pence exited the Task Force vehicle, walked to a nearby corner, and waited for the Durango pulled over next to her. Pence entered the Durango and sat in the back seat on the passenger side. Captain Porfidio, who "could clearly see that Mr. Maish was seated in the passenger seat" of the Durango, observed Maish take "something from his coat" and "Mr. Maish hand[ ] Ms. Pence something over his left shoulder." *Id.* at 190, 210. The Durango left the area for approximately two minutes, after which it returned to the same location, Pence exited the Durango, and Pence returned to the Task Force vehicle. Pence then gave Detective Lieberman a plastic baggie containing cocaine.

While the jury could have made different inferences from the evidence, we cannot say that the inference made by the jury here—that Maish was the one who transferred cocaine to Pence—was unreasonable. Based upon our review of the record, we conclude that evidence of probative value existed from which the jury could have found beyond a reasonable doubt that Maish committed dealing in cocaine as a class B felony. *See Toney v. State,* 715 N.E.2d 367, 369 (Ind.1999) (holding the evidence was sufficient to support the defendant's conviction for dealing in cocaine where the buyer/informant had not been searched prior to the purchase but testified regarding the buy transaction); *Hale v. State,* 875 N.E.2d 438, 445

---

**3.** With respect to Pence's testimony, Maish argues that "Pence herself cannot recall the events that transpired between herself and [Maish]." Appellant's Brief at 11. The record shows that Pence testified that she "just remember[ed] being picked up and being dropped off" that day and that she could not remember "actually making a transaction" with Maish because "it just happened so fast." Transcript at 269. However, as previously mentioned, Pence also testified that she remembered meeting with Maish and Maish providing her with cocaine in his vehicle. The jury was able to assess Pence's possibly conflicting testimony, credibility, and the evidence she offered. We will not reweigh the evidence. *See Drane,* 867 N.E.2d at 146.

(Ind.Ct.App.2007) (holding that the evidence was sufficient to support the defendant's conviction for dealing in cocaine and noting that officers were not able to see what transpired inside the defendant's house during the buy), *trans. denied;* *Hudson v. State,* 462 N.E.2d 1077, 1082–1083 (Ind.Ct.App.1984) (holding the evidence supported the jury's verdicts for dealing in a controlled substance and noting that the sole uncorroborated testimony of an informant-buyer is sufficient to convict, despite any arguable inadequacies in the control of the buy).

For the foregoing reasons, we affirm Maish's conviction for dealing in cocaine as a class B felony.

Affirmed.

CRONE, J., and MAY, J., concur.