

I N   T H E

# Court of Appeals of Indiana

State of Indiana,

*Appellant-Plaintiff*



FILED

Mar 28 2025, 9:01 am

C L E R K
Indiana Supreme Court
Court of Appeals
and Tax Court

v.

Wilberto Rivera,

*Appellee-Defendant*

---

March 28, 2025

Court of Appeals Case No.
24A-CR-1740

Appeal from the Marion Superior Court

The Honorable Marie L. Kern, Judge

Trial Court Cause No.
49D28-2309-F2-26434

---

**Opinion by Judge Bradford**
Chief Judge Altice and Judge Kenworthy concur.

**Bradford, Judge.**

# Case Summary

In September of 2023, the State charged Wilberto Rivera with Level 2 felony dealing in methamphetamine, Level 2 felony dealing in cocaine, and Level 4 felony dealing in a narcotic drug. The State initiated this appeal after the trial court granted Rivera's motion to suppress certain evidence, the suppression of which effectively precluded further prosecution of the charges against him. In challenging the trial court's order on appeal, the State contends that the trial court erred in finding that the search warrant had not been based on probable cause. We agree with the State and therefore conclude that the trial court erred in suppressing the challenged evidence. Accordingly, we reverse and remand to the trial court for further proceedings.

# Facts and Procedural History[1]

On September 13, 2023, Indiana State Police ("ISP") Detective David Salley filed a request for a search warrant for a residence located at 2741 Astro Drive in Indianapolis ("the Astro Drive Residence"). In support of his request, Detective Salley filed an affidavit, which established that he was an experienced law enforcement officer, who had been assigned "as a Detective to the Drug

---

[1] We held oral argument in this case on March 13, 2025, at Frankton Jr./Sr. High School. We wish to thank the students, faculty, administration, and staff of Frankton Jr./Sr. High School for their warm hospitality. We also commend counsel for the high quality of their arguments.

Enforcement Section" of the ISP since 2014. Ex. Vol. p. 27. Detective Salley averred that an investigation into the Astro Drive Residence had commenced after "documented [ISP] confidential informant ("CI") #7844 advised me that an individual ("Target 1") and his/her source of supply were selling methamphetamine out of" the Astro Drive Residence. Ex. Vol. p. 31 (bracketed information added).

[3] With regard to the CI, Detective Salley averred that the CI had "provided information that had been corroborated by independent law enforcement investigations as credible and reliable information" and was "cooperating with law enforcement in exchange for favorable consideration on his/her pending case." Ex. Vol. p. 31. Detective Salley reiterated that "[n]o promises" had been made to the CI regarding what consideration would be provided on the CI's current case. Ex. Vol. p. 31.

[4] Detective Salley further averred that during the months of August and September of 2023, law enforcement had conducted surveillance on the Astro Drive Residence, during which they had observed actions consistent with the sale of narcotics. Specifically, law enforcement had observed "a high volume of vehicular traffic arrive at the" Astro Drive Residence. Ex. Vol. p. 32. Unidentified individuals would exit the vehicles, approach the front of the residence, knock on the front door, and enter the Astro Drive Residence. The unidentified individuals would depart "approximately 10–15 minutes after arrival." Ex. Vol. p. 32. "The vehicles identified by law enforcement arriving and departing from the residence were not registered to" the Astro Drive

Residence. Ex. Vol. p. 32. Detective Salley averred that "[b]ased upon [his] training and experience," law enforcement's observations were "indicative of narcotics sales." Ex. Vol. p. 32.

[5] The probable cause affidavit also established that ISP had organized two nearly-identical controlled buys[2] between the CI and Target 1. With regard to each of these buys, Detective Salley averred that he and ISP Detective Rusty Slater had "met with the CI for the purpose of attempting to purchase methamphetamine" from Target 1 and the Astro Drive Residence. Ex. Vol. pp. 32, 33. Both of the controlled buys then proceeded as follows:

> [Detective Slater] had the CI remove all personal items from their … person…. The CI's person and vehicle were then searched for contraband, personal money, and weapons with negative results. The CI was then equipped with a covert electronic monitoring and recording device. [Detective Slater] provided the CI with United States currency, which was ISP buy money. The United States currency was copied by [Detective Slater] prior to providing it to the CI, to preserve evidence of the serial numbers of the bills.
>
> After providing the CI with buy money, the CI facilitated a recorded phone call to Target 1 to confirm the controlled buy of methamphetamine…. [L]aw enforcement followed the CI … to pick up Target 1 [at a Village Circle East address]. Law enforcement maintained constant surveillance on the CI while traveling to the Village Circle East address. Upon arrival, the CI picked up Target 1 in the previously searched vehicle. Law

<hr>

[2] Rivera's counsel conceded during oral argument that Detective Salley's affidavit establishes that the interactions between the CI and Target 1 qualified as "controlled buys."

enforcement maintained constant physical, audio, and video surveillance on the CI and Target 1 as they traveled to [the Astro Drive Residence] together in the CI's vehicle.

Upon arrival at the [Astro Drive Residence], the CI provided Target 1 with the previously recorded police buy money. Target 1 was observed by law enforcement's physical and video surveillance, exiting the CI's vehicle, and walk[ing] up to the front door of the [Astro Drive Residence]. Law enforcement observed the front door of the [Astro Drive Residence] open, and Target 1 entered the residence.

A short while later, Target 1 exited the [Astro Drive Residence] and walked back out to the CI's vehicle. Target 1 provided the CI with methamphetamine inside the CI's previously searched vehicle.

Law enforcement maintained constant surveillance on the CI and Target 1 as they traveled back to the Village Circle East address. Upon arrival[,] … the CI parked and Target 1 exited the CI's vehicle.…

The CI was then followed back to a pre-determined meet location by law enforcement. The CI gave [Detective Slater] the suspected methamphetamine that was purchased from Target 1 out of the [Astro Drive Residence].…

The CI's person and vehicle were then re-searched for contraband, weapons, and personal money with negative results. The suspected methamphetamine that was purchased by Target 1 from the [Astro Drive Residence] field tested positive for methamphetamine.

Ex. Vol. pp. 32–33.[3]  A search warrant for the Astro Drive Residence was issued that same day.

[6] The search warrant was executed at 9:36 a.m. on September 14, 2023, by an ISP SWAT team that included Detective Slater.  At the time of the search, Rivera was the sole occupant of the Astro Drive Residence.  Rivera told police that he "sometimes lives at the residence and is back and forth."  Appellant's App. Vol. II p. 25.  He further indicated that "his kids live at the residence."  Appellant's App. Vol. II p. 25.

[7] Just prior to the start of the search, Rivera told Detective Slater that "he did not want the house to be destroyed" and "the stuff of interest … was in the front bedroom in the closet."[4]  Appellant's App. Vol. II p. 25.  Several pieces of mail addressed to Rivera were found in the bedroom indicated by Rivera.  A search of the closet revealed numerous weapons, as well as the following:

> A plastic bag containing a plastic bag containing a crystal-like rock like substance, that was later weighed (330 Grams) including packaging, and field tested positive for meth.  A plastic bag containing a plastic bag containing a white chunk powder substance, that was later weighed (208 Grams) with packaging, and field tested positive for cocaine.  A clear plastic bag containing a white powdery substance that field tested positive for cocaine.  A plastic bag containing a white chunky substance

---

[3] The quoted information relates to the first controlled buy.  While there are some minor discrepancies between the exact words used by Detective Salley to describe the two controlled buys, his descriptions are largely the same, as each lay out in detail each step of the similar encounters between law enforcement, the CI, and Target 1, as well as the visits to the Astro Drive Residence.  *See* Ex. Vol. pp. 32–33, 33–34.

[4] Rivera would later deny making any statements about the closet.

that field tested positive for cocaine.[5]

> A plastic bag containing a plastic bag containing a white powder substance, that field tested positive for Fentanyl. A plastic bag containing a white powdery substance, a plastic bag containing a brownish colored powder that field tested positive for Amphetamine, a plastic bag containing a plastic bag containing a white chunky substance, two plastic bags containing a plant like substance that was located in jars in closet. A plastic bag containing a plant like substance that was located in a box on the west wall. Suspected Spice.[6] A pill press and three (3) scales and an open box of Great Value 200 count brand sandwich bags.

Appellant's App. Vol. II p. 26. Ammunition, specifically a box each of .22 caliber and .38 caliber ammunition, was also found in the closet.

[8] A safe in the garage was found to contain 1.2 kilograms of methamphetamine, 980 additional grams of suspected methamphetamine, 1.374 kilograms of cocaine, 592 additional grams of suspected cocaine, one kilogram of fentanyl pills, 548 grams of a plant-like substance, and fifty-seven grams of a brownish powdery substance. Law enforcement also found $68,858.00 in cash, ammunition, three digital scales, drug-test kits, and an Amazon package addressed to Rivera in the safe. A digital scale was also found on top of the

---

[5] The white powdery substance weighed forty-seven grams, and the white chunky substance weighed ten grams.

[6] The fentanyl weighed fifty-eight grams; the white powdery substance weighed thirty-two grams; the amphetamine weighed 103 grams; the white chunky substance weighed four grams; the two plastic bags containing a plant-like substance weighed 794 grams, combined; ant the suspected Spice weighed 3.3 pounds.

safe. All told, law enforcement found twenty-one firearms in the residence, including five that had previously been reported stolen.

[9] On September 18, 2023, the State charged Rivera with Level 2 felony dealing in methamphetamine, Level 2 felony dealing in cocaine, and Level 4 felony dealing in a narcotic drug. On March 15, 2024, Rivera moved to suppress all evidence recovered during the search of the Astro Drive Residence. Following a hearing, the trial court granted Rivera's motion, finding that Detective Salley's affidavit in support of the request for the search warrant "did not allege sufficient facts to establish 'controlled buys' as defined by Indiana case law, nor is the information contained in the affidavits sufficient to find the officers relied upon the warrant in good faith." Appellant's App. Vol. II p. 60. The case was dismissed pending appeal.

## Discussion and Decision

[10] In challenging the suppression of the evidence, the State contends that the trial court erred in finding that the search warrant had not been based on probable cause. Alternatively, the State contends that even if the search warrant had been lacking in probable cause, the trial court erred in granting Rivera's motion to suppress because the law enforcement officers had acted in good faith in relying on the search warrant.[7]

---

[7] Rivera argued at oral argument, for the first time, that the State had waived its good faith argument by not raising it below. We have held that "[w]aiver may be avoided if … the trial court actually addressed the issue

## I.    Applicable Law

The Fourth Amendment to the United States Constitution states in relevant part that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."  In determining whether there is probable cause to issue a warrant, "[t]he task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit ... there is a fair probability that contraband or evidence of a crime will be found in a particular place."  [*Ill. v. Gates*, 462 U.S. 213, 238 (1983)]. Courts reviewing such a decision should determine whether the magistrate had a "substantial basis" to conclude that probable cause existed.  [*Id.* at 238] (quoting *Jones v.* [*U.S.*, 362 U.S. 257, 271 (1960))].  "A substantial basis requires the reviewing court, with significant deference to the magistrate's determination, to focus on whether reasonable inferences drawn from the totality of the evidence support the determination of probable cause." *State v. Spillers*, 847 N.E.2d 949, 953 (Ind. 2006).  "Reviewing court" means not only the trial court's ruling on a motion to suppress, but also an appellate court's review of the trial court's ruling.  *Id.*

*State v. Tungate*, 899 N.E.2d 60, 64 (Ind. Ct. App. 2008) (first set of brackets in original).

---

in the absence of argument by the parties."  *Grathwohl v. Garrity*, 871 N.E.2d 297, 302 (Ind. Ct. App. 2007) (cited with approval in *Zanders v. State*, 73 N.E.3d 178, 185 n.5 (Ind. 2017), *vacated on other grounds*).  Both parties acknowledged during oral argument that the trial court had included a good faith discussion in its order granting Rivera's motion to suppress.  As such, the State's alternative argument relating to good faith has not been waived.

"Generally[,] we review a trial court's decision to grant a motion to suppress as a matter of sufficiency." *State v. Shipman*, 987 N.E.2d 1122, 1126 (Ind. Ct. App. 2013) (citing *State v. McCaa*, 963 N.E.2d 24, 29 (Ind. Ct. App. 2012), *trans. denied*). "On appeal, we will neither reweigh evidence nor judge witness credibility." *Id.* "Our role is to determine whether the record discloses substantial evidence of probative value that supports the trial court's decision." *Id.* (citing *State v. Washington*, 898 N.E.2d 1200, 1203 (Ind. 2008)).

## II. Analysis

"Both the Fourth Amendment to the United States Constitution and Article 1, Section 11 of the Indiana Constitution require probable cause for the issuance of a search warrant." *Id.* (citing *Casady v. State*, 934 N.E.2d 1181, 1188 (Ind. Ct. App. 2010), *trans. denied*.) "[P]robable cause is a fluid concept incapable of precise definition and must be decided based on the facts of each case." *Casady*, 934 N.E.2d at 1188. "Significantly, 'probable cause requires only a probability or substantial chance of criminal activity, not an actual showing of such activity.'" *Eaton v. State*, 889 N.E.2d 297, 299 (Ind. 2008) (quoting *Gates*, 462 U.S. at 245 n.13). "Probable cause is 'not a high bar[.]'" *Hodges v. State*, 125 N.E.3d 578, 581 (Ind. 2019) (quoting *Kaley v. U.S.*, 571 U.S. 320, 338 (2014)). "In deciding whether to issue a search warrant, the issuing magistrate's task is simply to make a 'practical, common-sense decision whether, given all the circumstances set forth in the affidavit, there is a fair probability that evidence of a crime will be found in a particular place.'" *Casady*, 934 N.E.2d at 1188–89

(quoting *Mehring v. State*, 884 N.E.2d 371, 376 (Ind. Ct. App. 2008), *trans. denied*).

[14] Again, when reviewing whether a search warrant was supported by probable cause, "[t]he duty of a reviewing court is to determine whether the magistrate had a 'substantial basis' for concluding that probable cause existed." *Shipman*, 987 N.E.2d at 1126. In considering whether the magistrate had a substantial basis for its decision, "[w]e consider only the evidence presented to the issuing magistrate, not after-the-fact justifications for the search." *Id.* "In determining whether an affidavit provided probable cause for the issuance of a search warrant, doubtful cases should be resolved in favor of upholding the warrant." *Id.*

[15] The State asserts that "[t]he probable cause affidavit in this case sufficiently established facts to show there was a fair probability that controlled substances would be found in [the Astro Drive Residence]." Appellant's Br. p. 14. In his affidavit filed in support of the State's request for a search warrant, Detective Salley presented facts relating to surveillance of the Astro Drive Residence by law enforcement. Detective Salley's affidavit indicated that during August and September of 2023, law enforcement had surveilled the Astro Drive Residence and had "observed a high volume of vehicular traffic" arrive at the Astro Drive Residence and "unidentified subjects" exit their vehicles, go into the Astro Drive Residence for a short time, exit, and leave. Ex. Vol. p. 32. The vehicles that visited for short periods of time had not been registered to the Astro Drive Residence. Based on Detective Salley's "training and experience," he indicated

that "a high volume of vehicular and pedestrian traffic at a residence" similar to what law enforcement observed "is indicative of narcotics sales." Ex. Vol. p. 32. We have previously considered similar evidence in reviewing whether a search warrant was supported by probable cause. *See Fuqua v. State*, 984 N.E.2d 709, 718 (Ind. Ct. App. 2013) (noting the detectives' observations of traffic arriving at and soon leaving from the residence, which the detectives believed was activity consistent with drug dealing), *trans. denied*.

[16] In addition to law enforcement's observations during surveillance, law enforcement had also conducted two separate controlled buys, both of which had included a short visit to the Astro Drive Residence. "A controlled buy occurs when an undercover police officer or a private citizen acting as an agent of the police under strict police supervision and control purchases illegal drugs from a dealer." *State v. Vance*, 119 N.E.3d 626, 630–31 (Ind. Ct. App. 2019), *trans. denied*.

> A controlled buy consists of searching the person who is to act as the buyer, removing all personal effects, giving him money with which to make the purchase, and then sending him into the residence in question. Upon his return he is again searched for contraband. Except for what actually transpires within the residence, the entire transaction takes place under the direct observation of the police. They ascertain that the buyer goes directly to the residence and returns directly, and they closely watch all entrances to the residence throughout the transaction.

*Mills v. State*, 177 Ind. App. 432, 434, 379 N.E.2d 1023, 1026 (1978).

> Presumably, the pre-buy search establishes the person making the purchase for the police does not have contraband prior to the transaction with the target. Surveillance during the transaction establishes the target as the source of the contraband and excludes other sources of contraband. Thus, any contraband discovered during a search after the transaction is attributable to the target of the controlled buy.

*Watson v. State*, 839 N.E.2d 1291, 1294 (Ind. Ct. App. 2005). As such, "[a] properly conducted controlled buy will permit an inference the defendant had prior possession of a controlled substance." *Id.* at 1293.

[17] In his affidavit, Detective Salley presented facts aimed at establishing the CI's trustworthiness, including that the CI was a documented ISP CI, who had "provided information that has been corroborated by independent law enforcement investigations as credible and reliable information." Ex. Vol. p. 31. Detective Salley detailed the steps taken by law enforcement in each of the controlled buys to establish control, including searching the CI's person and vehicle for contraband, equipping the CI with a covert electronic monitoring and recording device, providing the CI with ISP buy money, and maintaining constant surveillance of the CI throughout the controlled buy. It is undisputed that law enforcement's actions were sufficient to establish a controlled buy between the CI and Target 1. The question that remains is whether the circumstances were sufficient to tie the controlled buys to the Astro Drive Residence and create a fair probability that evidence of a crime would be found within the residence. *See Casady*, 934 N.E.2d at 1188–89. We conclude that they were.

[18]    In granting Rivera's motion to suppress, the trial court found that the circumstances of the controlled buys "mirror the facts in *Vance*[.]" Appellant's App. Vol. II p. 59.  In *Vance*, a panel of this court concluded that the circumstances at issue

> were not those of a previously-searched buyer entering a residence.  Police did not maintain strict control in this alleged tri-level (buyer-dealer-source) transaction where the alleged middle-man, who was not searched and did not act as an agent of police, moved about on his own volition and police surveillance was interrupted.  And although the cocaine ultimately produced would arguably have been attributable to the target, the sole connection between [the t]arget and Vance's residence, the premises to be searched, was that [the t]arget was seen leaving the residence.  Viewing someone exit a residence would not lead a reasonable person to believe that a search of those premises will uncover evidence of a crime.

119 N.E.3d at 631 (internal citations and quotations omitted).

[19]    Applying *Vance* to the facts of this case, the trial court determined that the State had not gained control over Target 1 and, as a result, had lost control of the buy when Target 1 had exited the CI's vehicle and entered the Astro Drive Residence.  Specifically, the trial court found that

> [t]he control over the buy is lost at this point, as the Target is free to move about on his own volition.  One cannot presume the Target obtained any illegal substances in the residence, regardless of any argument of a causal link between the Target's entrance into the residence and return moments later with contraband.

Appellant's App. Vol. II p. 60. The trial court also noted that because the affidavit lacked any information as to whether Target 1 had had any connection to the Astro Drive Residence, it created "a misleading impression that the Target is directly linked to the Astro Drive [R]esidence." Appellant's App. Vol. II p. 60. The trial court concluded that the affidavit submitted in support of the search warrant "did not allege sufficient facts to establish 'controlled buys' as defined by Indiana case law[.]" Appellant's App. Vol. II p. 60.

[20] The State recognizes that "this case did not involve a controlled buy from [the Astro Drive Residence], but only a controlled buy from Target 1 who appeared to be sourcing the drugs from [the Astro Drive Residence] during the controlled buys." Appellant's Br. p. 16. Nonetheless, the State asserts that Detective Salley's affidavit had

> established a nexus between the place to be searched and drug dealing in three distinct ways—(1) a tip, (2) observations of suspicious activities during long term surveillance, and (3) the seller's activities during two controlled buys. This was a sufficient nexus to show a substantial basis supporting the magistrate's finding of probable cause to issue the warrant.

Appellant's Br. p. 15. The State claims that while "the controlled buy of methamphetamine from Target 1 itself may not have provided probable cause to search" the Astro Drive Residence, the controlled buy "was only one part of a constellation of facts that provided suspicion that drugs would be found at [the Astro Drive Residence]. Those facts include the tip, surveillance, and

Target 1 visiting the residence before delivering drugs on both occasions."
Appellant's Br. p. 16.

[21] The State further asserts that *Vance* and a similar case, *Merritt v. State*, 803
N.E.2d 257 (Ind. Ct. App. 2004),[8] are readily distinguishable. In both *Vance*
and *Merritt*, this court concluded that the affidavits filed in support of the
requests for search warrants had failed to provide probable cause to connect the
alleged drug seller to the residence to be searched. *See Vance*, 119 N.E.3d at
631; *Merritt*, 803 N.E.2d at 260–61. The State distinguishes the instant matter
from *Vance* and *Merritt*, arguing that

> [t]his case is not like *Vance* or *Merritt* where the affidavits showed
> only a single and possibly incidental contact between a known
> drug dealer and the residence to be searched. Instead, the present
> affidavit indicated a significant nexus between the place to be
> searched and the criminal activity observed as it was likely the
> source of the drugs in multiple controlled buys as well as the
> other apparent transactions observed during the surveillance. *See
> Houser v. State*, 678 N.E.2d 95, 99 (Ind. 1997) (holding that
> probable cause exists if "based on the totality of the
> circumstances … there is a fair probability that a particular place
> contains evidence of a crime"). Also the State had other

---

[8] In *Merritt*, an unidentified male offered to sell a CI what appeared to be cocaine. 803 N.E.2d at 260. The affidavit in support of the search warrant alleged that cocaine was being sold out of Merritt's residence, claiming that the unidentified male had attempted to sell the CI cocaine while the CI was visiting Merritt's residence and that the residence was "under the control" of the individual who had attempted to sell cocaine to the CI. *Id.* at 258. Concluding that the affidavit failed to establish a sufficient link between the unidentified male and Merritt's residence, a panel of this court concluded that the trial court had abused its discretion in denying Merritt's motion to suppress the evidence recovered as a result of the search of his residence. *Id.* at 261.

evidence of drug dealing from [the Astro Drive Residence] based on the original tip from the reliable [CI].

Appellant's Br. pp. 17–18. The State further notes that while the trial court "seemed concerned by the mere possibility that Target 1 may have received the drugs from a different source, probable cause does not require officers to exclude every 'innocent explanation for suspicious facts.'" Appellant's Br. p. 18 (quoting *D.C. v. Wesby*, 583 U.S. 48, 61 (2018)). The State claims that because the "magistrate properly found probable cause to search the residence," the trial court "erred by suppressing the resulting evidence." Appellant's Br. p. 18.

[22] For his part, Rivera contends that the trial court properly granted his motion to suppress because the search warrant had not been supported by probable cause. Rivera asserts that "just because the State calls the interactions 'controlled' does not automatically make them so." Appellee's Br. p. 12. In making this assertion, Rivera claims that "Target 1 is [a] completely uncontrolled variable that taints the propriety of both buys" because it was not known whether Target 1 had any drugs on their person during either buy before entering the Astro Drive Residence. Appellee's Br. p. 11.

[23] Rivera also claims that the affidavit included hearsay without adequately establishing the CI's credibility. Specifically, Rivera argues that

> "[b]eyond a conclusory statement claiming the CI had given accurate and reliable information in the past, the affidavit did not mention or detail the basis of the [CI's] knowledge, whether the [CI] had a reputation for honesty, nor whether the [CI] predicted conduct or activity by the target that cannot ordinarily be easily

predicted. Most importantly, law enforcement failed to adequately independently investigate the informant's claims beyond cursory surveillance, which in turn failed to deliver any relevant facts or evidence to adequately corroborate the informant's claims.

Appellee's Br. p. 14. Rivera further argues that "[w]ithout further information to support the [CI's] credibility or independent investigation to corroborate the [CI's] tip, basis of knowledge, or general reliability, the CI's hearsay could not be relied upon to support the issuance of a search warrant." Appellee's Br. p. 15. Rivera argues that the facts presented in the affidavit were insufficient to establish probable cause.

[24] In its reply brief, the State disagrees with Rivera's claim that the CI's information had not been reliable. The State asserts that "the circumstances as a whole supported the … issuance of a warrant." Appellant's Reply Br. p. 4. The State claims that it had demonstrated the CI's trustworthiness in three ways: "(1) by the officer's affirmation that the informant had previously provided reliable information; (2) by observing activity at the residence consistent with drug dealing; and (3) by conducting controlled buys from a third party who visited that residence during each transaction to apparently procure his product." Appellant's Reply Br. pp. 4–5. The State concedes that the case "did not involve a controlled buy from" the Astro Drive Residence "but only controlled buys from Target 1 who plainly appeared to be sourcing his drugs from" the Astro Drive Residence. Appellant's Reply Br. p. 5. The State recognizes that the controlled buys, without more, might not have been

sufficient to establish probable cause as to the Astro Drive Residence but argues that the controlled buys were "highly relevant because they provided a strong inference that [the Astro Drive Residence] was an active drug source." Appellant's Reply Br. p. 6.

[25]	Upon review, we agree with the State. The totality of the evidence before the issuing judge was sufficient to establish probable cause. Detective Salley's affidavit in support of the search warrant had outlined observations that law enforcement had made during surveillance of the Astro Drive Residence, which, based on his training and experience, he had opined to be "indicative of narcotics sales." Appellant's App. Vol. II p. 32. Detective Salley had also detailed two controlled buys between the CI and Target 1, with the circumstances of both supporting the reasonable inference that the drugs in question had been sourced out of the Astro Drive Residence. Detective Salley had also established that the CI was known to law enforcement and had provided information that had been deemed reliable by independent investigation. Based on the facts and circumstances presented to it, the issuing judge made a "practical, common-sense decision" that there was "a fair probability that evidence of a crime [would] be found" in the Astro Drive Residence. *Casady*, 934 N.E.2d at 1188–89. We conclude that the issuing judge had a substantial basis for its decision that probable cause existed. As such, we also conclude that the trial court erred in granting Rivera's motion to suppress the evidence recovered from the search of the Astro Drive Residence. We

therefore reverse the judgment of the trial court and remand the matter for further proceedings.[9]

[26] The judgment of the trial court is reversed, and we remand for further proceedings.

Altice, C.J., and Kenworthy, J., concur.

ATTORNEYS FOR APPELLANT

Theodore E. Rokita
Indiana Attorney General

Justin F. Roebel
Supervising Deputy Attorney General

Daylon L. Welliver
Deputy Attorney General
Indianapolis, Indiana

---

[9] We additionally note that even if the search warrant had not been supported by probable cause, we would have had little trouble concluding that law enforcement had acted in good faith. The good-faith exception to the exclusionary rule has been recognized by Indiana's courts and codified at Indiana Code section 35-37-4-5. The good-faith exception

> allows courts to admit evidence that had been unlawfully seized if the police acted in "objective good faith." [*Jaggers v. State*, 687 N.E.2d 180, 184 (Ind. 1997) (citing *U.S. v. Leon*, 468 U.S. 897, 922 (1984)]. A police officer does not act in good faith if (1) the officer misled the magistrate by filing an affidavit that the affiant "'knew was false or would have known was false except for his reckless disregard for the truth'; or (2) the warrant was based on an affidavit 'so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable.'" *Id.* (quoting *Leon*, [468 U.S. at 923]).

*Caudle v. State*, 749 N.E.2d 616, 621 (Ind. Ct. App. 2001), *trans. denied*. In this case, nothing in the record suggests that Detective Salley had misled the issuing court by filing an affidavit that he "knew was false or would have known was false except for his reckless disregard for the truth." *Id.* (internal quotations omitted). Likewise, we cannot say that the affidavit, when read in its entirety, had been "so lacking in indicia of probable cause as to render … belief in its existence entirely unreasonable." *Id.* (internal quotations omitted).

ATTORNEY FOR APPELLEE

Jeffrey A. Baldwin
Voyles Vaiana Lukemeyer Baldwin & Webb
Indianapolis, Indiana